UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.                                              CRIMINAL NO. 05-10053-NMG

TYRONE BATTLE

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

The defendant Tyrone Battle respectfully submits this memorandum of law in support of his motion to suppress evidence and statements.

### STATEMENT OF FACTS[1]

On December 20, 2004, at around 3:30 p.m., a 911 operator from the Boston Police Department received a call from a woman, later identified as Latoya Capers, who said words to the effect that there was a light-skinned black guy with a gun in the hallway saying he was going to kill a girl. The caller did not identify herself, but gave an address of 15 Dunlap Street, Apartment One, Dorchester, Massachusetts. She did not identify the man by name or any other description; she also did not say that she had seen anyone with a gun, but only that she had heard someone yelling about a gun. The caller then hung up. The call to 911 was placed on a cell phone, and the 911 operator called back for additional information. At this point the woman who answered the phone informed the operator that the man had left the building and had gone into a neighbor's house.

A police dispatcher, not the 911 operator, subsequently radioed to police units the

---

[1] The following facts are derived from police reports, ATF reports, and the tape of the 911 call and police

1

report of an argument regarding a gun, with no description aside from a light-skinned black male threatening a female in the hallway of 15 Dunlap Street. The dispatcher also radioed the officers with the information that the male had left the building and was in a neighboring building.[2] Shortly thereafter, Boston Police Officers Griffiths, Puglia and Harlow, who were in plain clothes, arrived at 15 Dunlap Street, a triple-decker residence, and observed the main entryway of the building open. The officers also observed the front door to the first-floor apartment, which appeared to have been forced open, with the inside of the doorjamb forced off the frame. The officers entered the apartment to conduct a protective sweep, but did not find any victim or suspect inside the apartment.

Officers Harlow and Puglia then spoke with Ms. Capers and her godmother, Karen Jacobs, inside the third floor apartment. Capers and Jacobs stated that they heard a fight occurring between the first floor neighbors and that they heard something to the effect of, "Help me, help me Debbie, let me in. He's going to kill me." They also stated that they heard the word "gun" being yelled out at some point during the altercation.[3]

In the meantime, Officer Griffiths went to the apartment on the second floor and spoke with the tenant, Sandra Pringle. Ms. Pringle was asked if there was anyone in the apartment with her and she stated "just me and my kids." The officer asked her if she had heard any fighting downstairs and she stated that she had heard an argument but did not want to get involved. Officer Griffiths then asked if he could check the apartment, allegedly for her and her children's safety. Ms. Pringle at first declined, but after being

---

dispatcher in this case, provided in discovery.
[2] The tape recording of the police dispatcher also discloses that a canine unit was ordered to 15 Dunlap Street, but no mention of a dog was mentioned in any of the police or ATF reports, and it is not clear whether the dog ever was brought to the residence or for what purpose.
[3] A police report indicates that Ms. Jacobs told the police that she saw the man with a gun, but in subsequent interviews with her Ms. Jacobs denied that she made such a statement and was adamant that she did not see anyone with a gun.

told that the officers would get a search warrant, she acquiesced.

While checking the apartment, Officer Griffiths observed a blue or black bomber-style jacket on a kitchen chair. When asked about it, Ms. Pringle stated that it belonged to her brother. Officer Griffiths then when into one of the bedrooms and found a female, later identified as Chadena Awogboro, who had four children around her. Ms. Pringle stated that Awogboro was her sister-in-law. Officer Puglia then came into Pringle's apartment, to assist Griffiths, and stated that he had information that the victim was possibly inside apartment number two. Puglia asked the woman in the bedroom for her name, and she stated that it was "Joy."

Officer Griffiths then continued to search the bedroom, looked inside the closet, and under a pile of clothes found the defendant. Battle was taken out of the closet, handcuffed, allegedly for officer safety, and immediately read his <u>Miranda</u> rights. Battle was questioned about what happened, and he stated that he had forced his way into his apartment because his girlfriend had locked him out, and he was trying to retrieve some of his belongings. While Battle was being questioned, it was determined that there was an outstanding arrest warrant for him, and he was then transported to the police station for booking.

After Battle was taken away, the police conducted a second search of Pringle's apartment, at which point a firearm was found inside a bureau drawer of the bedroom where Battle and Awogboro had been located. The defendant made inculpatory statements as he was being taken out of the closet, and again at the police station.

3

## **ARGUMENT**

The Fourth Amendment commands that searches and seizures be reasonable. What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the seizure itself." United States v. Montoya Hernandez, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *see also* New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

### I. THE DEFENDANT HAD A REASONABLE AND LEGITIMATE EXPECTATION OF PRIVACY AS A SOCIAL GUEST IN THE APARTMENT AND THE UNLAWFUL INTRUSION BY THE POLICE VIOLATED HIS PERSONAL RIGHTS UNDER THE FOURTH AMENDMENT

The police made a warrantless entry into a private home in order to conduct a search. Battle was Sandra Pringle's social guest, and as such had a legitimate expectation of privacy within her apartment. *See* Minnesota v. Olson, 495 U.S. 89, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Olson stands for the proposition that any guest, in appropriate circumstances, may have a legitimate expectation of privacy when he is there 'with the permission of his host, who is willing to share his house and his privacy with his guest.'" United States v. Fields, 113 F.3d 313, 321 (2nd Cir. 1997) (quoting Olson, 495 U.S. at 99, 110 S.Ct. at 1689)). *See also* United States v. Rhiger, 315 F.3d 1283 (10th Cir. 2003). Thus, Battle's Fourth Amendment rights were violated when the police initially entered the apartment and subsequently searched it twice, and not just when he was physically seized.

II. **THE WARRANTLESS POLICE ENTRY AND SEARCH OF THE SECOND-FLOOR APARTMENT AT 15 DUNLAP STREET WAS UNREASONABLE AND NOT SUBJECT TO ANY WELL-ESTABLISHED EXCEPTIONS**

The Fourth Amendment's prohibition against unreasonable searches and seizures forbids most warrantless searches. Warrantless searches are presumptively illegal. *See* Katz, 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d 576 (stating that warrantless searches are *per se* unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions").

**A. The Initial Police Entry and Search Was Not a Valid Protective Sweep**

The police indicated to Ms. Pringle that they wanted to search her apartment "for her and her children's safety." The police report also indicates that Officer Griffiths was checking in the closet where Battle was found "while conducting a protective sweep." The courts have consistently held that "the Constitution permits police officers, entering a house with an arrest warrant, to conduct a protective sweep of the house provided that the officers possess a 'reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" United States v. Daoust, 916 F.2d 757, 759 (1st Cir. 1990) (quoting Maryland v. Buie, 494 U.S. 325, 337 (1990)). "[A] 'protective sweep' is 'no more lightly taken than any other instance where the government seeks to justify an unwarranted search....'" United States v. Gerry, 845 F.2d 34, 36 (1st Cir. 1988) (quoting United States v. Hatcher, 680 F.2d 438, 443 (6th Cir. 1982).

The protective sweep described in Buie was conducted pursuant to an arrest for which there was a valid warrant. In that case, the police had properly established probable cause with respect to the targeted individual and the area he occupied. That critical fact is

5

missing here, as there was no warrant to search or arrest. "These are not unimportant limitations on the Buie rule; at the very least, it would be a significant expansion of Buie to hold that it applies to a seizure and subsequent search of a person for whom there was no arrest warrant, at the threshold of a dwelling for which there is no search warrant." United States v. Johnson, 170 F.3d 708, 716 (7th Cir. 1999). *But see* United States v. Gould, 364 F.3d 578 (5th cir. 2004) (cert. den. 125 S.Ct. 437, 160 L.Ed.2d 317 (2004)) (arrest is not always an element on an in-home protective sweep). Defendant maintains that the initial entry and search of the apartment was not a valid sweep because the police were not there to execute an arrest warrant.[4] *See* United States v. Yousif, 308 F.3d 820 (8th Cir. 2002) (finding a quantum of individualized suspicion, only after an investigative stop occurs, cannot provide reasonable suspicion that would justify the stop itself under the Fourth Amendment).

Furthermore, the scope of the sweep went beyond that which is constitutionally allowed. A protective sweep is limited to a quick search of premises. United States v. Weems, 322 F.3d 18, 21 (1st Cir. 2003). Moreover, this search "must be 'narrowly confined to a cursory visual inspection of those places in which a person might be hiding' ... and can last 'no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.'" United States v. Paradis, 351 F.3d 21, 29 (1st Cir. 2003) (quoting Buie, 494 U.S. at 335-36)). In the case at bar, the police first searched a bedroom where they found Ms. Awogboro and spoke with her, then searched inside the bedroom closet and underneath a pile of clothes. This went beyond the scope of a protective sweep, which does not entail a

---

[4] Defendant concedes that there was an outstanding arrest warrant for him at the time, but the police did now know that until after the search.

6

full search of the premises. Any item seized during a protective sweep must be in plain view. United States v. Luna-Rojas, 28 F.Supp.2d 54, 61 (D.P.R. 1998).

### B. The Police Entry and Search Was Not Based on Probable Cause

The 911 call did not justify the warrantless entry into the second-floor apartment. Generally, if a structure is divided into more than one occupancy unit, probable cause must exist for each unit to be searched. Mena v. City of Simi Valley, 226 F.3d 1031 (9th Cir. 2000). In order for probable cause to search to exist, a police officer must have reasonably trustworthy information of supporting facts and circumstances such as would persuade a person of reasonable caution to believe a search is justified. United States v. Infante-Ruiz, 13 F.3d 498 (1st Cir. 1994).

Based on what the police knew at the time of entry, that a couple had been fighting in the hallway, and the first-floor apartment's door was broken open, there was no probable cause to enter or search the apartment. There was no information that the person with the gun was inside the apartment. In fact, the 911 call indicates that the man had left the building. No one placed the suspect inside the second-floor apartment. When questioned, Ms. Pringle stated that only she and her kids were there. She also stated that she heard the argument downstairs but "did not want to get involved." None of this added up to probable cause to search the apartment.

### C. The Police Entry and Search Was Not Based on Exigent Circumstances

Even assuming *arguendo* that the police had probable cause to believe that the suspect was inside the second-floor apartment, the entry into the apartment was not justified. "Even when supported by probable cause, warrantless entries into a person's home are *per se* unreasonable unless justified by exigent circumstances." United States v.

7

Moore, 790 F.2d 13, 15 (1st Cir. 1986); United States v. Khounsavanh, 113 F.3d 279 (1st Cir. 1997). *See also* United States v. Hidalgo, 747 F.Supp. 818 (D. Mass. 1990) (warrantless entry into home for purposes of search or arrest must be justified by both probable cause and exigent circumstances.").

There are four recognized categories of exigent circumstance that justify a warrantless search: (1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself. Fletcher v. Town of Clinton, 196 F.3d 41 (1st Cir. 1999). In this case, only the last category could arguable apply. However, exigent circumstance cannot validate the entry and search of the second-floor apartment because, at the time of the entry, there was no evidence that there was someone inside the apartment who was in distress and in need of their assistance, or that the suspect was inside the apartment. As noted above, Ms. Pringle stated that only she and her kids were in the apartment, and indicated that she did not want to get involved with the couple's argument. There is no indication that she was in distress, and no sounds were emanating from the apartment indicating that anyone else was in trouble or endangered. *See* United States v. Morales, 913 F.Supp. 132, 134 (D.R.I. 1996). As such, there were no exigent circumstances to merit the warrantless entry and search.

**D. The Police Entry and Search Was Not Based Voluntary Consent**

"[O]ne of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." United States v. Meléndez, 301 F.3d 27, 32 (1st Cir. 2002) (quoting Schneckloth

v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973)). "[A] search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." Groh v. Ramírez, 24 S.Ct. 1284, 1291 (2004) (quoting Cámara v. Municipal Court, 387 U.S. 523, 528-29 (1967)). A warrantless search is not unreasonable "where voluntary consent has been obtained, either from the individual whose property is searched, ..., or from a third party that possesses common authority over the premises." United States v. Torres, 188 F.Supp.2d 155, 157-58 (D.P.R. 2002) (citation omitted); *see also* Illinois v. Rodríguez, 497 U.S. 177, 181 (1990). Courts have held that when consent is given by one "who possesses common authority over the premises or effects," this consent will be deemed valid "against the absent, non-consenting person with whom that authority is shared." United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003) (quoting United States v. Matlock, 415 U.S. 164, 170 (1974)).

Additionally, in order for consent to be valid it must be given voluntarily. United States v. Weidul, 329 F.3d 1, 7 (1st Cir. 2003); United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999); United States v. Barnett, 989 F.2d 546, 544-55 (1st Cir. 1993). In examining the voluntariness of the consent, the courts look at the totality of the circumstances. United States v. Luciano, 329 F.3d 1, 7 (1st Cir. 1999); United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993). When looking at the totality of circumstances the court should pay close attention to individualized factors bearing on the vulnerability of the consenting party, which are "age, education, experience, intelligence and knowledge of the right to withhold consent." Barnett, 989 F.2d at 555. In addition, one of the factors to take into consideration when analyzing the totality of the circumstances is whether the police used a ruse or deception to gain entry. United States

9

v. Maldonado Garcia, 655 F.Supp. 1363, 1366 (D.P.R. 1987). Mere submission to a claim of lawful authority is not proof of valid consent to search. United States v. Rodriguez, 931 F. Supp. 907 (D. Mass. 1996).

In the case at bar, the police told Ms. Pringle that if she did not give her consent to search they would obtain a search warrant. As argued above, the police did not have probable cause to search the apartment, and thus Pringle's acquiescence to the search was achieved through misrepresentation.[5] "Although some courts have found nothing wrong with the use of ruses and have stated that 'consent is not necessarily violated by deception and subterfuge on the part of the police,' other courts have condemned said strategy holding that 'when a government agent used deceit, trickery, or misrepresentation to secure consent to search, said consent has been held to be involuntary.'" United States v. Benezario, 339 F.Supp.2d 361, 367 (D.P.R. 2004) (quoting United States v. Andrews, 746 F.2d 247 (5th Cir. 1984)) (citing United States v. Scherer, 673 F.2d 176, 181-82 (7th Cir. 1982); United States v. Wright, 641 F.2d 602 (8th Cir. 1981), United States v. Raines, 536 F.2d 796, 799-800 (8th Cir. 1976); United States v. Tweel, 550 F.2d 297 (5th Cir. 1977); United States v. Robson, 477 F.2d 13 (9th Cir. 1973); United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990); United States v. Giraldo, 743 F.Supp.152, 154 (E.D.N.Y. 1990). As such, Ms. Pringle's consent was not voluntary because it was based on police misrepresentation that they would be able to get a search warrant, and, at best, was mere acquiescence to the show of police authority.

Finally, the consent form signed by Pringle is invalid, because it was signed after

---

[5] Defendant avers that the police must have known that they did not have probable cause to search the apartment when there were no allegations or other evidence that the suspect was inside. Defendant's argument is buttressed by the fact that none of the police reports indicate that the entry and search were made pursuant to probable cause.

the police seized the gun. When using a consent form to obtain consent to search, the form must be signed before the search is conduced; otherwise the consent is invalid. See United States v. Tibbs, 49 F.Supp.2d 47, 53 (D. Mass. 1999).

### III. ANY STATEMENTS MADE BY THE DEFENDANT MUST BE SUPPRESSED BECAUSE THEY WERE TAINTED BY THE INITIAL ILLEGAL SEARCH

As argued above, the defendant maintains that the search of the second-floor apartment where he was found was illegal. Because that police action was unconstitutional, that illegality taints the subsequent statements made as a result of his seizure and arrest. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Three factors are used in determining whether the taint of prior illegal conduct has been purged: (1) the temporal proximity between the illegal conduct and the incriminating statements; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. Brown, *supra*. See also Paradis, 351 F.3d 34. In the instant case, Battle's statements to the police were made United States v. Thomas, 190 F.Supp.2d 49, 64 (D. Me. 2002) (inculpatory statements of defendant, arrested for being felon in possession of firearm, to police officer at county jail, after receiving Miranda warnings, were required to be suppressed as fruit of poisonous tree, as discovery of firearm which was "but for" cause of his arrest was illegal). Similarly, in the case at bar, the defendant's statements were tainted by the illegal entry and search of the apartment, and that taint was not sufficiently dissipated. As such, all of defendant's statements must be suppressed.

11

## **CONCLUSION**

WHEREFORE, for the above-stated reasons, the defendant respectfully moves that his motion to suppress evidence and statements be granted.


Respectfully submitted,
TYRONE BATTLE
By his attorney


/s/_____
Mark W. Shea
BBO No. 558319
Shea, LaRocque & Wood LLP
47 Third Street, Suite 201
Cambridge MA  02141-1265
617.577.8722