UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.                                    CRIMINAL NO. 05-10053-NMG

TYRONE BATTLE

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

### INTRODUCTION

On June 22, 2005, defendant Tyrone Battle filed a motion to suppress with

memorandum in support (docket numbers 22 and 23). Subsequently, on June 27, 2005,

the First Circuit Court of Appeals issued a decision, U.S. v. Martins, 2005 WL 1502939

(1st Cir. June 27, 2005), which impacts defendant's case. Defendant respectfully submits

this supplemental memorandum of law to address those issues.

The appeal in Martins addressed "novel questions related to (i) the contours of the

'emergency aid' branch of the exigent circumstances doctrine and (ii) the authority of law

enforcement officers to conduct a protective sweep following a warrantless but lawful

entry into a private residence." Id. at *1. Defendant submits that the decision does not

affect his argument as the facts are distinguishable.

### FACTS IN *MARTINS*

On February 10, 2002, Boston police detective Daniel Linskey was responding to

the scene of a gang shooting. Linskey was directed to an apartment building by a witness

who said one of the shooting victims was inside. Linskey entered the first-floor common

1

area of the building and saw a man he knew as "Fats" sitting outside Apartment No. 1,

bleeding from a gunshot wound to the leg. Fats told Linskey that he was sitting on a

kitchen chair that he had received from "his boy" inside Apartment No. 1. Linskey then

noticed a strong odor of marijuana wafting from within Apartment No. 1. He knocked on

the door and an adult male voice asked who it was. Linskey stated he was a police officer

and asked to speak to the occupant. He then heard voices and the sound of movement,

followed by utter silence.

Linskey waited about ninety seconds then knocked again. This time a young boy,

about eleven or twelve years old, opened the door and stepped back into the foyer.

Linskey noticed marijuana smoke drifting through the air and asked the boy if his parents

or anyone else was home. The boy, whose voice was markedly different from the voice

that had originally responded, said no. Linskey then stepped into the apartment and

noticed an even younger girl watching television in a bedroom. When he was about three

or four feet inside the threshold, Linskey heard yelling outside. This was the defendant,

Christopher Martins, who entered the apartment from the common hallway. Martins asked

Linskey what he was doing there and Linskey replied that he was investigating a shooting.

Referring to the marijuana smoke, Linskey asked whether anyone was in the apartment

with the children. Martins said that he was in charge and that nobody else was present.

By that time several other officers had arrived and were gathered in the common

hallway. Linskey ordered them to conduct a protective sweep of the premises to determine

whether the adult who originally had answered Linskey's knock was still present. In a

bedroom, Linskey discovered José DeVeiga sitting on a bed surrounded by marijuana

smoke. Linskey asked where the marijuana was hidden, and DeVeiga denied that he had

any marijuana.  At this point Martins stated that he had been smoking marijuana and pointed to two cold marijuana roaches in an ashtray.  Linskey told Martins that the roaches could not have been the source of the clouds of smoke in the room, and announced that he would obtain a search warrant.  Both DeVeiga and Martins were arrested, the police secured the apartment, and a search warrant was rapidly obtained and executed.  The police discovered a handgun and rifle ammunition, as well as a dish containing crack cocaine residue.

### ARGUMENT

Martins challenged both the initial entry into the apartment and the subsequent protective sweep.  *Id.* at *3.  The First Circuit found that the search was valid for under both challenges.  Defendant Tyrone Battle maintains that his case is distinguishable from Martins, and that the evidence seized by the police, as well as any statements he made, should be suppressed.

## I.    EMERGENCY AID DOCTRINE

The court cited to the same four categories of exigent circumstance cited by Battle in his original memorandum:  "(1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself."  (Def. Memo at 8; Martins at *3 (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995))).  The Martins court went on to say, however, that "[t]he Hegarty list is not an exclusive compendium, and the government's principal argument here invokes another species of exigent circumstances:  the emergency aid doctrine."  Martins at *4 (citing Mincey v. Arizona, 437

U.S. 385, 392 (1978)).

Under this doctrine, the police may enter a residence without a warrant in an emergency situation "if they reasonably believe that swift action is required to safeguard life or prevent serious harm." Martins at *4. Under this doctrine the government must show "a reasonable basis, approximating probable cause, both for the officers' belief that an emergency exists and for linking the perceived emergency with the area or place into which they propose to intrude." Id.

The First Circuit found that, under the fact of that case, the initial warrantless entry was justified by the emergency aid doctrine. The court cited to the following facts: an adult male voice had initially responded to Detective Linskey's knock, followed by the sounds of voices, movement and then silence. After knocking again a young boy answered and the apartment was filled with thick marijuana smoke. The boy stated he was home alone, which the court found to be a "dubious proposition in light of Linskey's knowledge that an adult male had been inside the dwelling moments earlier." Id. The court found that the officer "could have been reasonably certain either that a man seeking to conceal himself from the police was using the boy as a pawn in a dicey game of hide-and-seek or that the man had bolted and left the boy unsupervised." Id. Either way the officer had ample cause to believe that the boy needed emergency assistance, especially given that the boy was present in the midst of a crime of marijuana smoking and was exposed to toxic smoke, which justified the warrantless entry. Id.

The case at bar is in marked contrast to Martins. Here the police were investigating a report of a man with a gun threatening someone in the stairwell. They gained entry into the second-floor apartment, yet no one had placed the suspect inside that

4

apartment. In fact, the 911 call indicated to the police that the man had left the building. Furthermore, an adult, Sandra Pringle, answered the officer's knock, and stated that only she and her kids were there, that she had heard an argument downstairs, but did not want to get involved. Given these facts, the officer could not have reasonably believed that swift action was required to safeguard life or prevent serious harm. As such, the emergency aid doctrine is inapplicable to the case at bar.

## II.    PROTECTIVE SWEEP

Martins also challenged the legality of the protective that the police conducted after the initial warrantless entry. Defendant in the instant case concedes that the holding in Martins, that "police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry," Id. at *6, undercuts his argument that Maryland v. Buie, 494 U.S. 325 (1990) limits protective sweeps to instances where the police are executing an arrest warrant.[1]

Nonetheless, the search of the second-floor apartment was not justified as a valid protective sweep. As argued in defendant's original memorandum, there were no exigent circumstances that would have justified a sweep, because the police did not have reasonable suspicion to believe that someone in the apartment posed a danger. There was no reasonable basis for believing that the man with the gun was inside the apartment. Furthermore, there was no indication that Ms. Pringle was in distress, or that anyone else in the apartment was in trouble or endangered.

By contrast, in Martins the police were investigating a gang shooting in which two

---

[1] Defendant does not hereby waive any other portion of his original argument, including that regarding the scope of the protective sweep.

men were wounded, that had occurred within 100 yards of the apartment building, and the apartment that the police searched was tied to the shootings because one of the victims had retreated there. Additionally, the police "knew from experience that victims in gang-area shootings often were gang members themselves and tended to congregate with other gang members." *Id*. at *7. The police knew that there was a high probability that a man was hiding inside the apartment, and, "[t]o cinch matters, immediately before the sweep the defendant claimed that he was in charge and that no one else was on the premises. Linskey had good cause to disbelieve the second half of that statement and reasonably could have suspected that the mysterious possessor of the adult voice posed a threat." *Id*. The <u>Martins</u> court held that, taking these facts together, "the high-crime area, the shootings, their connection with the apartment, the officer's experience and knowledge anent gang behavior, the evasive action of the adult known to be present behind the door, and the seeming attempt to misinform," was sufficient to ground a reasonable suspicion that the unknown adult posed a threat to the officers on the scene that justified the protective sweep. *Id*.

Because the police in the case at bar did not possess facts such as would create reasonable suspicion that someone inside the second-floor apartment posed a threat, the protective sweep was not justified.

## **CONCLUSION**

WHEREFORE, for the above-stated reasons, as well as the reasons stated in his

original memorandum, the defendant respectfully moves that his motion to suppress

evidence and statements be granted.


Respectfully submitted,
TYRONE BATTLE
By his attorney


/s/_____
Mark W. Shea
BBO No. 558319
Shea, LaRocque & Wood LLP
47 Third Street, Suite 201
Cambridge MA  02141-1265
617.577.8722

**Westlaw Download Summary Report for LAROCQUE,JEAN 4677475**

| | |
|---|---|
| Date/Time of Request: | Thursday, July 14, 2005 12:16:00 Central |
| Client Identifier: | BATTLE |
| Database: | CTA |
| Citation Text: | 2005 WL 1502939 |
| Lines: | 953 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

2005 WL 1502939                                                                    Page 1
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.
UNITED STATES of America, Appellee,
v.
Christopher MARTINS, Defendant, Appellant.
**No. 04-1474.**

Heard May 3, 2005.
Decided June 27, 2005.

**Background:** After his motion to suppress was denied, defendant was convicted by jury in the United States District Court for the District of Massachusetts, William G. Young, J., of being felon in possession of ammunition and possessing cocaine base with intent to distribute. Defendant appealed.

**Holdings:** The Court of Appeals, Selya, Circuit Judge, held that:

(1) emergency aid branch of exigent circumstances doctrine justified officer's warrantless entry into defendant's apartment;

(2) police who have lawfully entered residence possess same right to conduct protective sweep whether arrest warrant, search warrant, or existence of exigent circumstances prompted their entry;

(3) police had reasonable suspicion justifying protective sweep of defendant's apartment;

(4) prior felony convictions were not related for purposes of career offender sentencing;

(5) defendant did not preserve *Booker* claims for appeal;

(6) *Booker* error resulting from application of mandatory sentencing scheme was not plain error; and

(7) claim of ineffective assistance of counsel was premature. Affirmed.

**[1] Criminal Law ☞1139**

110k1139 Most Cited Cases

**[1] Criminal Law ☞1158(2)**

110k1158(2) Most Cited Cases
Proceedings
When Fourth Amendment challenge involves mixed questions of fact and law, Court of Appeals reviews district court's factual findings for clear error and then reviews de novo its ultimate conclusion that discerned facts provide sufficient legal basis to justify the conduct about which defendant complains. U.S.C.A. Const.Amend. 4.

**[2] Searches and Seizures ☞26**

349k26 Most Cited Cases
It is a bedrock principle that the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home. U.S.C.A. Const.Amend. 4.

**[3] Searches and Seizures ☞24**

349k24 Most Cited Cases
Warrantless police entry into a residence is presumptively unreasonable under Fourth Amendment unless it falls within the compass of one of a few well-delineated exceptions. U.S.C.A. Const.Amend. 4.

**[4] Searches and Seizures ☞42.1**

349k42.1 Most Cited Cases

**[4] Searches and Seizures ☞43**

349k43 Most Cited Cases
Exigent circumstances exception to general rule that warrantless police entry into a residence is presumptively unreasonable under Fourth Amendment encompasses those situations in which some compelling reason for immediate action excuses law enforcement officers from pausing to obtain a warrant, such as (1) hot pursuit of a fleeing felon, (2) threatened destruction of evidence inside a residence before a warrant can be obtained, (3) a risk that the suspect may escape from the residence undetected, or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or herself. U.S.C.A. Const.Amend. 4.

**[5] Searches and Seizures ☞42.1**

349k42.1 Most Cited Cases
Under emergency aid branch of exigent circumstances doctrine, police, in an emergency situation, may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life or prevent serious harm. U.S.C.A. Const.Amend. 4.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1502939                                                                                    Page 2
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

**[6] Searches and Seizures** ⟐42.1

349k42.1 Most Cited Cases

To rely upon emergency aid branch of exigent circumstances doctrine permitting warrantless entry by police, government must show a reasonable basis, approximating probable cause, both for officers' belief that an emergency exists and for linking the perceived emergency with the area or place into which they propose to intrude, and the requisite inquiry must be undertaken in light of the totality of the circumstances confronting the officers, including any need for an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences. U.S.C.A. Const.Amend. 4.

**[7] Controlled Substances** ⟐130

96Hk130 Most Cited Cases

Emergency aid branch of exigent circumstances doctrine justified officer's warrantless entry into defendant's apartment, given that officer, after hearing adult male voice inside, was informed by young boy who opened door of apartment, which was filled with thick marijuana smoke, that boy was home alone, and thus could have been reasonably certain either that man seeking to conceal himself from police was using boy as pawn or that man had bolted and left boy unsupervised, and given that boy was present in midst of ongoing crime of marijuana use and was exposed to toxic smoke, placing his welfare at risk. U.S.C.A. Const.Amend. 4.

**[8] Searches and Seizures** ⟐42.1

349k42.1 Most Cited Cases

Law enforcement officers may not manipulate events to create an emergency and bootstrap that invented emergency into a justification for a warrantless entry of a person's home. U.S.C.A. Const.Amend. 4.

**[9] Criminal Law** ⟐1028

110k1028 Most Cited Cases

Argument made by defendant for the first time on appeal was forfeited.

**[10] Arrest** ⟐71.1(4.1)

35k71.1(4.1) Most Cited Cases

Baseline rule is that police officers, in conjunction with an arrest on residential premises, may undertake a protective sweep so long as they can point to articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area harbors an individual posing a danger. U.S.C.A. Const.Amend. 4.

**[11] Arrest** ⟐63.5(8)

35k63.5(8) Most Cited Cases

Police officer may pat down an individual for concealed weapons upon a reasonable suspicion that the individual might be armed, provided that the officer's belief is grounded in specific and articulable facts. U.S.C.A. Const.Amend. 4.

**[11] Searches and Seizures** ⟐70

349k70 Most Cited Cases

Police officer may pat down an individual for concealed weapons upon a reasonable suspicion that the individual might be armed, provided that the officer's belief is grounded in specific and articulable facts. U.S.C.A. Const.Amend. 4.

**[12] Searches and Seizures** ⟐71

349k71 Most Cited Cases

Reasonable suspicion needed to justify a protective sweep is no more and no less than that required for *Terry* investigative stop. U.S.C.A. Const.Amend. 4.

**[13] Arrest** ⟐63.5(4)

35k63.5(4) Most Cited Cases

Reasonable suspicion required for *Terry* investigative stop is an objective standard, and its existence centers upon the objective significance of the particular facts under all the circumstances; this standard is considerably less demanding than the level of proof required to support a finding of probable cause. U.S.C.A. Const.Amend. 4.

**[14] Searches and Seizures** ⟐71

349k71 Most Cited Cases

The scope of a protective sweep is limited, in that the underlying doctrine allows only a cursory inspection by police of those spaces in which a person may be found, and the sweep may last no longer than is necessary to dispel the reasonable suspicion of danger, and in any event no longer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1502939                                                                      Page 3
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

than it takes to complete the arrest and depart the premises.
U.S.C.A. Const.Amend. 4.

**[15]** Searches and Seizures ⟞⟝71
349k71 Most Cited Cases
Police who have lawfully entered a residence possess the
same right to conduct a protective sweep whether an arrest
warrant, a search warrant, or the existence of exigent
circumstances prompted their entry. U.S.C.A.
Const.Amend. 4.

**[16]** Searches and Seizures ⟞⟝71
349k71 Most Cited Cases
Police had reasonable suspicion that someone in defendant's
apartment posed danger, justifying protective sweep
undertaken after officer's lawful warrantless entry into
apartment based on exigent circumstances, given that
shootings which prompted officer's knock on apartment
door occurred within 100 yards of apartment complex, that
one of shooting victims, who was not resident of apartment,
had retreated there, that police knew that victims in
gang-area shootings were often gang members who tended
to congregate with other gang members, that officer knew of
distinct possibility that man was hiding inside apartment,
and that officer had good cause to disbelieve defendant's
claim that no one else was on premises. U.S.C.A.
Const.Amend. 4.

**[17]** Arrest ⟞⟝63.5(4)
35k63.5(4) Most Cited Cases
Mere presence in a high-crime area, without more, is
insufficient to meet the reasonable suspicion benchmark
under Fourth Amendment principles. U.S.C.A.
Const.Amend. 4.

**[18]** Arrest ⟞⟝63.5(4)
35k63.5(4) Most Cited Cases
In conducting Fourth Amendment reasonable suspicion
inquiry, courts should recognize that veteran law
enforcement officers are entitled to rely on their experience.
U.S.C.A. Const.Amend. 4.

**[19]** Sentencing and Punishment ⟞⟝1309
350Hk1309 Most Cited Cases
Defendant's prior two felony convictions for crimes of

violence were not "related," for purposes of determining
whether defendant qualified as career offender under
Sentencing Guidelines, even though same state judge
disposed of both charges on same day during same hearing,
given that offenses occurred several months apart and the
record of prior sentencing contained no formal order
consolidating prior convictions nor any persuasive indicium
of formal consolidation, such as a docket entry. U.S.S.G. §§
4A1.2(a)(2),    4A1.2,    comment.(n.3(C)),    4B1.1(a),
4B1.2(c)(2), 18 U.S.C.A.

**[20]** Jury ⟞⟝34(1)
230k34(1) Most Cited Cases
That judge, rather than jury, determined "fact" that
defendant's prior felony convictions were not related for
purposes of sentencing defendant as career offender under
Sentencing Guidelines did not violate Sixth Amendment.
U.S.C.A. Const.Amend. 6; U.S.S.G. § 4B1.1(a), 18
U.S.C.A.

**[21]** Jury ⟞⟝34(1)
230k34(1) Most Cited Cases
Sixth Amendment is not violated simply because a judge
finds sentencing facts under Sentencing Guidelines.
U.S.C.A. Const.Amend. 6; U.S.S.G. § 1B1.1 et seq., 18
U.S.C.A.

**[22]** Criminal Law ⟞⟝1035(1)
110k1035(1) Most Cited Cases
Defendant did not preserve for appeal *Booker* issue of
whether sentence imposed under mandatory Sentencing
Guidelines scheme violated Sixth Amendment when he
argued in district court that acceptance-of-responsibility
guideline punished him for going to trial, in violation of his
Sixth Amendment rights, inasmuch as such argument bore
no relation to *Booker* concerns that factual determinations
by jurors were constitutionally required to impose certain
sentences. U.S.C.A. Const.Amend. 6; U.S.S.G. § 3E1.1, 18
U.S.C.A.

**[23]** Criminal Law ⟞⟝1035(1)
110k1035(1) Most Cited Cases
District court's off-hand observation at sentencing hearing
respecting applicability of Supreme Court's decision in
*Apprendi v. New Jersey* to determinate sentencing schemes,
followed by comment that court's concern did not apply to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 1502939                                                                    Page 4
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

defendant's case, was insufficient to preserve for appeal *Booker* claim that sentence imposed by court, pursuant to mandatory Sentencing Guidelines scheme, violated Sixth Amendment, inasmuch as court's rumination formed no part of its rulings or holdings. U.S.C.A. Const.Amend. 6; U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[24]** Criminal Law ☞1042
110k1042 Most Cited Cases
Forfeited *Booker* errors arising from sentencing of defendant under mandatory Sentencing Guidelines scheme engender plain-error review. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[25]** Criminal Law ☞1030(1)
110k1030(1) Most Cited Cases
Under plain error review, defendant must show (1) that an error occurred (2) which was clear or obvious and which not only (3) affected defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.

**[26]** Criminal Law ☞1042
110k1042 Most Cited Cases
Defendant did not show that he would have received more lenient sentence had district court sentenced him under advisory, rather than mandatory, Sentencing Guidelines scheme, and therefore *Booker* error resulting from application of mandatory scheme was not "plain error," given that defendant's age and family circumstances were recounted in presentence investigation report (PSI) but were not remarked upon by court at sentencing, and that court refused to grant downward departure for which defendant was eligible, on grounds that his criminal history overstated his past criminality, due to its view that sentence imposed was just. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[27]** Criminal Law ☞1042
110k1042 Most Cited Cases
To prove, under plain error review, that *Booker* error arising from sentencing of defendant under mandatory Sentencing Guidelines scheme affected defendant's substantial rights, defendant must show a reasonable probability that he would have received a more lenient sentence under an advisory guidelines regime. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[28]** Criminal Law ☞1440(2)
110k1440(2) Most Cited Cases
Claim of ineffective assistance of counsel raised on direct appeal was premature, and thus would not be considered by Court of Appeals; claim was properly raised via motion to vacate. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2255.

**[29]** Criminal Law ☞641.13(1)
110k641.13(1) Most Cited Cases
Establishing ineffective assistance of counsel requires a showing that the defense attorney turned in a constitutionally deficient performance that prejudiced defendant's substantial rights. U.S.C.A. Const.Amend. 6.

**[30]** Criminal Law ☞1035(7)
110k1035(7) Most Cited Cases
In all but extraordinary circumstances, claim of ineffective assistance of counsel that is raised for the first time on appeal will not be entertained. U.S.C.A. Const.Amend. 6.
Appeal from the United States District Court for the District of Massachusetts, William G. Young, U.S. District Judge.

Wendy Sibbison, by appointment of the court, for appellant.

Virginia M. Vander Jagt, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

Before SELYA, Circuit Judge, BALDOCK, [FN*] Senior Circuit Judge, and HOWARD, Circuit Judge.

SELYA, Circuit Judge.

**\*1** In this case, defendant-appellant Christopher Martins challenges the district court's denial of his motion to suppress the critical evidence used to convict him. His appeal raises novel questions related to (i) the contours of the "emergency aid" branch of the exigent circumstances doctrine and (ii) the authority of law enforcement officers to conduct a protective sweep following a warrantless but lawful entry into a private residence. After answering these and other questions, we affirm the defendant's conviction and sentence.

**I. BACKGROUND**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1502939                                                                                          Page 5
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

Given the principal focus of this appeal, we glean the facts, as supportably found by the district court, from the record of the suppression hearing. We supplement these facts, as necessary, with other facts contained in the record. Once the stage is set, we map the travel of the case.

### A. *The Facts.*

On the evening of February 10, 2002, Sergeant Detective Daniel Linskey responded to a radio call from an anti-gang unit about a shooting at the corner of Wendover and Dudley Streets in Boston's Roxbury section. Upon his arrival, he discovered a victim nursing a gunshot wound. The wounded man could not provide any useful information about the shooting.

A bystander informed Linskey that there was a second victim up the street. Linskey proceeded north on Wendover Street for about 100 yards. Another bystander directed him to an apartment building. Linskey entered the structure's first-floor common area and saw a man he knew as "Fats" sitting in a kitchen chair outside Apartment No. 1. The area was otherwise devoid of furniture. Linskey asked Fats, who was bleeding from a gunshot wound to the leg, where he had gotten the chair. Fats replied that he had received it from "his boy" inside Apartment No. 1.

At that juncture, Linskey approached the exterior door of the apartment. He immediately noticed a strong odor of marijuana wafting from within. He knocked on the door and an adult male voice asked him to identify himself. Linskey replied that he was a police officer and asked to speak with the occupant. He next heard voices and the sound of movement coming from within the apartment. This was followed by utter silence.

After ninety seconds or so, Linskey knocked again and asked to speak with the occupant. A young boy (perhaps eleven or twelve years old) opened the door and stepped back into the foyer of the apartment. The interior was poorly lit, but Linskey noticed marijuana smoke drifting through the air. He asked the youth whether his parents were home or whether anyone else was in the unit. The boy responded in the negative. His voice was markedly different from the voice that had originally spoken to Linskey from behind the closed door.

Linskey then stepped into the apartment and spied an even younger girl watching television in a bedroom. When he was three or four feet inside the threshold, he heard yelling from outside. This proved to be the defendant, who entered the apartment by way of the common hallway. The defendant asked what Linskey was doing there and Linskey replied that he was investigating a shooting. Adverting to the marijuana smoke, Linskey asked whether anyone was in the apartment with the children. The defendant said that he was in charge and that nobody else was present.

**\*2** By that time, several other officers had arrived at the scene and gathered in the common hallway. Linskey ordered them to undertake a protective sweep of the premises to ascertain whether the adult who originally had answered Linskey's knock was still there. During the suppression hearing, Linskey testified that he ordered the sweep for a variety of reasons, including the location of one of the shooting victims immediately outside the apartment, the marijuana smoke within, and the presence of young, apparently unsupervised children. The principal impetus for his decision, however, was that he had heard an older man speak from within the apartment, yet both the youngster who answered the door and the defendant insisted that no one else was there. Linskey indicated that he was not sure who this other man was, what involvement he may have had with the shootings, or even whether the defendant was aware that someone might have entered the apartment. Given these manifold uncertainties, Linskey was concerned for the safety of everyone involved.

The sweep quickly bore fruit. In a bedroom, Linskey discovered José DeVeiga sitting on a bed, wrapped in a cloud of marijuana smoke. DeVeiga seemed to be under the influence of drugs. Linskey patted DeVeiga down, found no weapons, and asked where the marijuana was stashed. When DeVeiga denied having any marijuana, an incredulous Linskey remarked the thick marijuana smoke filling the room.

At that point, the defendant volunteered that he had been smoking marijuana and called Linskey's attention to two marijuana roaches in an ashtray on the floor. Linskey told the defendant that the cold roaches could not have been the source of the billowing smoke. He then announced that he

would obtain a search warrant in an effort to locate the marijuana and instructed other officers to "freeze" the apartment. He thereupon arrested both DeVeiga and the defendant for possession of marijuana and placed the two children in a relative's care.

The police rapidly obtained and executed a search warrant for the premises. The ensuing search retrieved, inter alia, handgun and rifle ammunition, as well as a Pyrex dish containing crack cocaine residue.

### B. *Travel of the Case.*

On June 11, 2003, a federal grand jury in the District of Massachusetts indicted the defendant on charges of (i) being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1) and (ii) possessing cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The defendant moved to suppress the evidence found in the apartment on Fourth Amendment grounds. He contended that the warrantless entry was neither consensual nor justified by exigent circumstances and that the protective sweep was unlawful.

The government opposed the motion and, on October 27, 2003, the district court convened a suppression hearing. Only Linskey testified. The court deemed his account credible in all relevant respects. It then made a series of findings. We summarize them.

**\*3** . The child's actions at the threshold did not indicate either explicit or implicit consent to enter.

. Exigent circumstances authorized Linskey to enter; he had reasonable cause to fear for the safety of the boy, given the ongoing drug crime and the possibility that he was unattended or that one or more adults who were participating in that crime were present in the apartment.

. The totality of the circumstances afforded Linskey a basis for reasonable suspicion that someone in the apartment posed a danger to him or to others and, thus, justified a protective sweep. The apartment was in a high-crime area; there had been a recent shooting nearby and it was reasonable to infer that the shooting was gang-related; and Fats might well have been allied with a gang, so that his retreat to Apartment No. 1 might have represented a retreat to a place where his confederates resided.

On the basis of these findings, the court denied the motion to suppress.

The case culminated in a four-day trial. The jury convicted on both counts. The district court held the disposition hearing on March 25, 2004. At that session, the court, relying on the presentence investigation report (PSI Report), found that the defendant was a career offender. *See* USSG § 4B1.1. The defendant unsuccessfully objected to this designation. The court calculated the guideline sentencing range to be 210-262 months.

The prosecution sought a sentence at the midpoint of that range, whereas the defendant sought a downward departure on the ground that his criminal history category substantially overrepresented the seriousness of his prior criminality. The court agreed with the overrepresentation claim, but weighed the overrepresentation against a number of aggravating factors present in the crimes of conviction and refused to depart downward. When all was said and done, the court imposed a 210-month incarcerative term. This appeal followed.

## II. DISCUSSION

The defendant's asseverational array includes Fourth Amendment challenges to both the initial entry into his apartment and the subsequent protective sweep; objections to his sentence; and a complaint anent ineffective assistance of counsel. We address these three categories of claims sequentially.

### A. *The Fourth Amendment Claims.*

[1] Both aspects of the defendant's Fourth Amendment challenge involve mixed questions of fact and law. Consequently, we assay the district court's factual findings for clear error and then review de novo its ultimate conclusion that the discerned facts constitute a sufficient legal basis to justify the conduct about which the defendant complains. *See United States v. Schaefer, 87 F.3d 562, 565 & n. 2 (1st Cir.1996)*; *United States v. Tibolt, 72 F.3d 965, 969 (1st Cir.1995)*.

[2][3][4] **1. *Warrantless Entry.*** It is a bedrock principle that the prophylaxis of the Fourth Amendment is at its zenith

with respect to an individual's home. *See Kyllo v. United States,* 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Thus, a "warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well-delineated exceptions." *United States v. Romain,* 393 F.3d 63, 68 (1st Cir.2004). Some of these exceptions are bundled together under the heading of "exigent circumstances"--a heading that encompasses those situations in which some compelling reason for immediate action excuses law enforcement officers from pausing to obtain a warrant. *See Tibolt,* 72 F.3d at 969. Common examples of exigent circumstances include "(1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence in a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself." *Hegarty v. Somerset County,* 53 F.3d 1367, 1374 (1st Cir.1995).

**\*4** The *Hegarty* list is not an exclusive compendium, and the government's principal argument here invokes another species of exigent circumstances: the emergency aid doctrine. *See Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (noting, in dictum, that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within [a private residence] is in need of immediate aid"). The *Mincey* dictum has prompted several courts to designate a general "emergency aid" category as a genre of exigent circumstances sufficient to justify a warrantless entry into a home. *See, e.g., United States v. Holloway,* 290 F.3d 1331, 1337 (11th Cir.2002); *United States v. Richardson,* 208 F.3d 626, 630 (7th Cir.2000); *Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.1963) (Burger, J.). We joined this parade in *United States v. Beaudoin,* 362 F.3d 60, 66 (1st Cir.), *cert. denied,* --- U.S. ----, 125 S.Ct. 484, 160 L.Ed.2d 357 (2004). [FN1]

**[5][6]** Under this doctrine the police, in an emergency situation, may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life or prevent serious harm. *See id.* To rely upon the doctrine, the government must show a reasonable basis,

approximating probable cause, both for the officers' belief that an emergency exists and for linking the perceived emergency with the area or place into which they propose to intrude. *Id.* The requisite inquiry must be undertaken in light of the totality of the circumstances confronting the officers, including, in many cases, a need for an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences. *See id.*

**[7]** In applying this yardstick in the case at hand, we survey the objective facts known to Linskey in the time frame leading up to his entry. *See Tibolt,* 72 F.3d at 969. Upon knocking on the door, Linskey heard an adult male voice, followed by conversation, movement, and then silence. Upon a second knock, the door opened to reveal a young boy in an apartment filled with thick marijuana smoke. The child indicated that he was home alone--a dubious proposition in light of Linskey's knowledge that an adult male had been inside the dwelling moments earlier. [FN2] It seemed implausible that the boy was unaware of the man's presence; indeed, the two most likely inferences were that the boy was dissembling or that the man had fled. Thus, the officer could have been reasonably certain either that a man seeking to conceal himself from the police was using the boy as a pawn in a dicey game of hide-and-seek or that the man had bolted and left the boy unsupervised.

Either way, the child was present in the midst of an ongoing crime (marijuana use) and was exposed to toxic smoke, placing his welfare at risk. The officer would have been remiss had he eschewed any attempt to ameliorate the boy's plight. Because this parlous state of affairs gave Linskey ample cause to believe that the boy needed emergency assistance, it justified his entry. *See* 3 Wayne R. LaFave, Search and Seizure § 6.6(a) (4th ed.2004) (stating that warrantless "entry for the purpose of rendering aid is reasonable ... [in order] to assist unattended small children") (collecting cases).

**\*5** This holding is within the mainstream of Fourth Amendment jurisprudence. Other courts have found exigent circumstances in similar situations. In *United States v. Bradley,* 321 F.3d 1212 (9th Cir.2003), the police became aware that a nine-year-old boy was potentially home alone

after his mother's arrest. *Id.* at 1213. After receiving no response to repeated knocking, the police announced their presence, entered the home through an unlocked back door, and discovered the child. *Id.* at 1214. The Ninth Circuit emphasized that the officers were aware that a child was home alone but were not aware of conditions inside the house. *Id.* at 1215. Based primarily on those facts, the court reasoned that the "possibility of a nine-year-old child in a house in the middle of the night without the supervision of any responsible adult is a situation requiring immediate police assistance." *Id.* Consequently, the court found the officers' warrantless entry justified under the emergency aid doctrine. *Id.*

So too *United States v. Hughes,* 993 F.2d 1313 (7th Cir.1993), in which the police learned that an adolescent--a thirteen-year-old girl--was inside a house occupied by persons smoking crack cocaine. *Id.* at 1314. A police officer entered without a warrant, explaining that he had done so because he "did not know if [the girl] was being held against her will, or if she was there using drugs." *Id.* at 1315. Predicated on the officer's reasonable belief that the child might be in danger, the Seventh Circuit found that exigent circumstances justified the entry. *See id.*

The defendant seeks to debunk the reasonableness of Linskey's belief that the boy was in need of emergency assistance. He points to several cases in which risk to children was found not to amount to exigent circumstances. *See, e.g., Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1240-41 (10th Cir.2003); *Calabretta v. Floyd,* 189 F.3d 808, 813 (9th Cir.1999); *Good v. Dauphin County Social Servs. for Children & Youth,* 891 F.2d 1087, 1095 (3d Cir.1989). But without exception, these cases involve much less ominous fact patterns. Far from helping the defendant, they put the situation here into clearer focus. Unlike, say, the officer in *Calabretta,* 189 F.3d at 813, Linskey did not enter the home based on some unsubstantiated report of possible danger; rather, he personally witnessed a child at the center of illicit drug activity and had reasonable cause to believe that the child either had been abandoned or else forced to help conceal an adult's presence. The moment cried out for an immediate entry.

[8] The defendant makes a last-ditch effort to blunt the force

of this conclusion: he suggests that the exigency was manufactured by the police and, thus, cannot justify their warrantless entry. While we agree that law enforcement officers may not manipulate events to create an emergency and bootstrap that invented emergency into a justification for a warrantless entry of a person's home, *see United States v. Curzi,* 867 F.2d 36, 43 n. 6 (1st Cir.1989), that principle is unavailing here.

*6 [9] We rest this holding on two grounds. In the first place, the defendant's "manufactured evidence" argument is made for the first time on appeal. It is, therefore, forfeited. *See B & T Masonry Constr. Co. v. Pub. Serv. Mutual Ins. Co.,* 382 F.3d 36, 40 (1st Cir.2004) (explaining that "legal theories not raised squarely in the lower court cannot be broached for the first time on appeal") (internal quotation marks omitted). In the second place, given the district court's supportable credibility determination, the record cannot sustain a claim that Linskey manipulated events to conjure up an emergency. For aught that appears, he was simply doing a difficult job under difficult circumstances.

That ends this aspect of the matter. We hold that notwithstanding the absence of a warrant, the officer's entry into the defendant's apartment was justified by exigent circumstances. [FN3]

[10][11][12] **2. The Protective Sweep.** The defendant's remaining Fourth Amendment plaint focuses on the legality vel non of the protective sweep that the officers conducted after entering the apartment. The baseline rule is that police officers, in conjunction with an arrest on residential premises, may undertake a protective sweep so long as they can point to "articulable facts which, taken together with the rational inferences from those facts," would warrant a reasonably prudent officer in believing "that the area harbor[s] an individual posing a danger." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (internal quotation marks omitted). This standard is an extension of the doctrine that permits a police officer to pat down an individual for concealed weapons upon a reasonable suspicion that the individual might be armed, provided that the officer's belief is grounded in "specific and articulable facts." *Id.* at 331-32 (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The

2005 WL 1502939                                                      Page 9
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

reasonable suspicion needed to justify a protective sweep is "no more and no less than was required in *Terry.*" *Id.* at 334.

[13] Reasonable suspicion is an objective standard; its existence "centers upon the objective significance of the particular facts under all the circumstances." *United States v. Woodrum,* 202 F.3d 1, 7 (1st Cir.2000). That standard is considerably less demanding than the level of proof required to support a finding of probable cause. *Romain,* 393 F.3d at 71.

[14] The scope of a protective sweep is limited: the doctrine allows only a "cursory inspection of those spaces where a person may be found." *Buie,* 494 U.S. at 335. The sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

[15] Although *Buie* itself speaks of protective sweeps incident to arrest, this court has employed the doctrine to allow protective sweeps in conjunction with the execution of search warrants. *See Drohan v. Vaughn,* 176 F.3d 17, 22 (1st Cir.1999); *United States v. Daoust,* 916 F.2d 757, 759 (1st Cir.1990). Since police officers lawfully may enter a home either with a warrant or upon probable cause plus exigent circumstances, *see Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002) (per curiam), it would make no sense to hold that the police may conduct a protective sweep when lawfully entering with a warrant but must refrain from doing so when lawfully entering on the basis of exigent circumstances. In either event, the key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk. We hold, therefore, that police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry. *See United States v. Gould,* 364 F.3d 578, 584-87 (5th Cir.2004) (en banc) (stating that a protective sweep may be justified so long as police did not enter illegally); *United States v. Taylor,* 248 F.3d 506, 513 (6th Cir.2001) (holding that because officers can constitutionally secure an area while awaiting a search warrant to ensure that evidence will not be destroyed, "it follows logically that ... the police may conduct a limited

protective sweep [of that area] to ensure the safety of those officers"); *cf. United States v. Garcia,* 997 F.2d 1273, 1282 (9th Cir.1993) (permitting protective sweep when police were lawfully present in a home by consent); *United States v. Patrick,* 959 F.2d 991, 996 (D.C.Cir.1992) (declaring, in the context of a consensual entry, that "[o]nce the police were lawfully on the premises, they were authorized to conduct a protective sweep").

**\*7** [16] Beyond his general objection to the availability of the protective sweep doctrine in the case of entries premised on exigent circumstances, the defendant also asserts that the protective sweep undertaken in this case transgressed the Fourth Amendment because the police did not have reasonable suspicion to believe that someone in the apartment posed a danger. In this regard, he contends that the only real basis for suspecting danger was the apartment's location in a high-crime plagued by gang activity.

[17] If this were so, the defendant's point would be well-taken; mere presence in a high-crime area, without more, is insufficient to meet the reasonable suspicion benchmark. *See Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *United States v. Quinn,* 815 F.2d 153, 162 (1st Cir.1987). Here, however, the defendant reads the record much too myopically. There were other factors in addition to the location of the apartment in a high-crime neighborhood that contributed to the formation of reasonable suspicion. We explain briefly.

[18] The shootings, in which two men were wounded, had occurred within 100 yards of the apartment complex. Moreover, the apartment was tied to the shootings because one of the victims, not a resident of the apartment, had retreated there. The police knew from experience that victims in gang-area shootings often were gang members themselves and tended to congregate with other gang members. [FN4] *Cf.* William Turner, Rescuing of the Romish Fox (1545) ("Birds of a feather flock together."). Given these facts, the inference of danger was much more real and immediate than a generic fear of what might happen in a high-crime area.

Then, too, the officer knew that there was a distinct possibility that a man was hiding inside the apartment. That

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

possibility, in itself, elevated the level of suspicion. *Cf. Wardlow*, 528 U.S. at 124 (holding evasive behavior and flight to be pertinent factors in the reasonable suspicion calculus). To cinch matters, immediately before the sweep the defendant claimed that he was in charge and that no one else was on the premises. Linskey had good cause to disbelieve the second half of that statement and reasonably could have suspected that the mysterious possessor of the adult voice posed a threat. *See United States v. Cavely*, 318 F.3d 987, 996 (10th Cir.2003) (holding protective sweep justified where homeowner arrested outside his home told officers that he had a "friend" inside, but friend did not appear after police announced their presence); *United States v. Talley*, 275 F.3d 560, 564 (6th Cir.2001) (holding protective sweep justified when police were aware of two additional persons inside a home and were "misinformed about their presence" by the owner).

Taking these facts in the ensemble--the high-crime area, the shootings, their connection with the apartment, the officer's experience and knowledge anent gang behavior, the evasive action of the adult known to be present behind the door, and the seeming attempt to misinform--we find them sufficient to ground a reasonable suspicion that the unknown adult posed a threat to the officers on the scene. That suspicion justified the protective sweep.

### B. *The Sentencing Claims.*

**\*8** The defendant launches a two-pronged attack on his sentence. He argues both that his classification as a career offender was erroneous and that his sentence, viewed in light of the Supreme Court's recent decision in *United States v. Booker*, --- U.S. ----, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), was infected by reversible error. We consider each claim separately.

[19] **1. *Career Offender Status.*** In order to qualify as a career offender, a defendant must have "at least two prior felony convictions of either a crime of violence or a controlled substance offense." USSG § 4B1.1(a). Even when a defendant has two prior felony convictions, however, the sentencing court must count them as a single prior felony if they are "related." *Id.* §§ 4A1.2(a)(2), 4B1.2(c)(2). Prior convictions are considered related if they "were consolidated for trial or sentencing." *Id.* § 4A1.2, cmt.

n. 3(C).

At the time of his conviction in this case, the defendant had prior felony convictions for assault and battery on a police officer and assault with a dangerous weapon (both violent crimes). The underlying offenses occurred several months apart (one on November 2, 2000 and the other on May 29, 2001). The defendant nonetheless strives to convince us that they are related because the same state court judge disposed of both charges on the same day during the same hearing. We are not persuaded.

We need not tarry. This question is controlled by our decision in *United States v. Correa*, 114 F.3d 314 (1st Cir.1997). There, we held that when dealing with

> offenses that are temporally and factually distinct (that is, offenses which occurred on different dates and which did not arise out of the same course of conduct), charges based thereon should not be regarded as having been consolidated (and, therefore, 'related') unless the original sentencing court entered an actual order of consolidation or there is some other persuasive indicium of formal consolidation apparent on the face of the record which is sufficient to indicate that the offenses have some relationship to one another beyond the sheer fortuity that sentence was imposed by the same judge at the same time.

*Id.* at 317.

In the district court's view, the defendant's two prior offenses were temporally and factually distinct and the record contained no evidence of formal consolidation. Consequently, the court followed *Correa* and ruled that the offenses were not related. The defendant assigns error, insisting that the state court record indicates that a "functional consolidation" had occurred.

This harangue is flatly inconsistent with our holding in *Correa* . There, we held that, for guideline purposes, "consolidation" requires more than common disposition. *Id.* at 317. The critical datum, we said, is whether the record of the earlier sentencing(s) shows any indicia of *formal* consolidation, the existence of which would establish the necessary nexus between the charges. *Id* . at 317-18. Because the defendant does not identify either a formal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

order of consolidation or any other persuasive indicium of formal consolidation (such as a docket entry), his attempt to treat these two distinct offenses as one necessarily fails.

**\*9 2. *Booker* Error.** We turn next to the defendant's claim that *Booker* error tainted his sentence. This claim is cast in two forms.

[20][21] The first iteration need not detain us. The defendant asseverates that the Sixth Amendment, as interpreted by *Booker,* was violated when a judge and not a jury determined the "fact" that his prior convictions were not related. Assuming arguendo that relatedness might be a fact that a judge could not determine pursuant to a mandatory guidelines system--a dubious proposition at best--the defendant's asseveration nonetheless must fail. Our holding in *United States v. Antonakopoulos,* 399 F.3d 68 (1st Cir .2005), is pellucid that the Sixth Amendment is not violated simply because a judge finds sentencing facts under the guidelines; rather, the error is only that the judge did so pursuant to a mandatory guidelines system. *Id.* at 75 (interpreting *Booker* ).

[22] The second iteration of the defendant's sentencing argument embodies a conventional *Booker* claim. That such an error occurred cannot be gainsaid; the district court, acting before the Supreme Court decided *Booker,* understandably treated the guidelines as mandatory. In reviewing this error, the threshold question is whether it was preserved below.

The defendant proffers two reasons why we should deem the error preserved: (i) he argued in the lower court that the guideline provision permitting a downward adjustment for acceptance of responsibility, USSG § 3E1.1, constituted an unconstitutional burden on his Sixth Amendment right to a jury trial; and (ii) the district court mused, sua sponte, that there were no *Apprendi* issues involved in the sentencing. *See Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We explore these proffers.

In light of the unexpected nature of *Booker's* holding that the sentencing guidelines must be treated as advisory, we have been fairly liberal in determining what sorts of arguments sufficed to preserve claims of *Booker* error in

pre-*Booker* cases. *See, e.g., United States v. Heldeman,* 402 F.3d 220, 224 (1st Cir.2005); *Antonakopoulos,* 399 F.3d at 76. We have stated that we typically will regard *Booker* error as preserved if the defendant below argued that a guideline application transgressed either *Apprendi* or *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), "or that the Guidelines were unconstitutional." *Antonakopoulos,* 399 F.3d at 76. The defendant seizes on the quoted language and asserts that his argument that the acceptance of responsibility guideline was unconstitutional suffices to preserve his present (much different) claim of *Booker* error. We do not agree.

Although the language in *Antonakopoulos* is broad, it cannot be dislodged from its contextual moorings. The cases leading up to *Booker* dealt with the notion that the Sixth Amendment required jurors to determine facts that were necessary to the imposition of a certain sentence. *See Booker,* 125 S.Ct. at 748-50 (discussing *Apprendi* and *Blakely* ). The sentencing guidelines suffered from this flaw, but the *Booker* Court opted to cure it by invalidating those provisions of the Sentencing Reform Act that made the guidelines mandatory. *See id.* at 764-65.

**\*10** The *Antonakopoulos* formulation for the preservation of claims of *Booker* error must be read against this background. *See Antonakopoulos,* 399 F.3d at 75-76. It follows that the sort of constitutional challenges sufficient to preserve claims of *Booker* error in pre-*Booker* cases must fall at least arguably within the encincture of the constitutional concerns raised in *Apprendi, Blakely,* and *Booker.* The defendant's challenge below, which posited that the acceptance of responsibility guideline impermissibly "punished" him for going to trial and, thus, was an unconstitutional infringement of his Sixth Amendment rights, bears no relation to the concerns raised by *Apprendi, Blakely,* and *Booker.* It follows inexorably that this challenge did not preserve the defendant's nascent *Booker* claim.

[23] The defendant's alternate proffer fares no better. He cites *United States v. Paradis,* 351 F.3d 21 (1st Cir.2003), for the proposition that a party's failure to advance an issue in the district court may be excused (and, thus, the error may be deemed preserved) if the district court raises the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1502939                                                                    Page 12
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

issue on its own. *See id. at 28-29.* The *Paradis* opinion will not bear the weight that the defendant loads upon it.

In that case, the government failed to argue explicitly that a police officer's warrantless search was justified by the protective sweep doctrine. *Id.* at 28. The government had, however, cited a case in its brief that discussed the doctrine. *Id.* at 28 n. 6. We explained that, ordinarily, a bare citation would be insufficient to preserve an issue for appellate review but deemed the error preserved nonetheless because the district court had pounced on the citation and incorporated the cited case's discussion of the protective sweep doctrine into its ruling. *Id.* at 28-29 & n. 6. *Paradis* thus stands for the proposition that an issue suggested by a party but insufficiently developed is nonetheless preserved for appeal when the trial court, on its own initiative, seizes the issue and makes an express ruling on its merits.

*Paradis* is plainly inapposite here. During the sentencing hearing, the district judge made a transient observation about the applicability of *Apprendi* to determinate sentencing schemes, but noted that his concern had no application to the case at hand. That rumination formed no part of the court's rulings or holdings, and it would blink reality were we to allow the defendant to piggyback upon the court's off-hand comment, promoted by neither party, and use it as a means of "preserving" his claim of *Booker* error. We conclude, therefore, that the defendant's claim of *Booker* error was not preserved.

[24][25][26] Forfeited *Booker* errors engender plain-error review. *See United States v. Vega Molina,* 407 F.3d 511, 533 (1st Cir.2005); *United States v. González-Mercado,* 402 F.3d 294, 302 (1st Cir .2005). Consequently, the defendant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Duarte,* 246 F.3d 56, 60 (1st Cir.2001). Here, the defendant has successfully negotiated the first two steps of this pavane. *See Antonakopoulos,* 399 F.3d at 77 (holding that the court commits a clear and obvious error whenever it sentences a defendant pursuant to a mandatory guidelines regime). He stumbles, however, at the third step.

**\*11** [27] In order to prove that a *Booker* error affected a defendant's substantial rights, the defendant must show a reasonable probability that he would have received a more lenient sentence under an advisory guidelines regime. *González-Mercado,* 402 F.3d at 303; *Antonakopoulos,* 399 F.3d at 78-79. To clear this hurdle, the defendant in this case relies upon the fact that the sentencing court, pursuant to the mandatory guidelines, was either forbidden or discouraged from taking into account several characteristics (e.g., his age and family circumstances).

We find the defendant's reliance misplaced. Nearly all the factors to which he alludes were limned in the PSI Report, yet the district court chose not to speak to them at sentencing. The inference is that the court was unimpressed. *See United States v. Figuereo,* 404 F.3d 537, 542 (1st Cir.2005).

The only new information proffered at the appellate level--an affidavit recounting the alleged sexual abuse of two of the defendant's siblings by another family member--seems to be in direct contradiction of his statement to the probation officer that there was no history of abuse in the family. Even in the roiled wake of *Booker,* we are reluctant to allow a party to profit by a calculated repudiation of a prior version of events solemnly given to a probation officer and submitted to the district court.

By way of explanation, the defendant's able appellate counsel makes a plausible argument that this chapter in the defendant's past was shameful to him and, thus, he did not express it given the apparent uselessness of such information for sentencing purposes. But even were we to assume arguendo that this new information is properly before us, other circumstances would stymie the defendant's efforts to justify resentencing on this basis. The district court found the defendant eligible for a downward departure based on the fact that his criminal history score substantially overstated the seriousness of his prior criminality. Yet the court declined to depart, stating:

[T]he record ... is that of a young man who is deeply, deeply engaged both in dealing illicit drugs, in a variety of thefts, which it appears have a significant relationship to gaining, possessing, or the threat of using firearms. And so I think you're very dangerous. And for that reason,

2005 WL 1502939                                                                                                    Page 13
--- F.3d ---
**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

though your prior convictions ... would allow me to depart downward, the most that I think is just is to go [to the bottom of the guideline sentencing range].

This passage makes clear that, despite its grave concern about the fairness of the sentencing guidelines in general--a concern that pops up repeatedly throughout the transcript of the disposition hearing--the court deemed a 210- month sentence just. Given this frank evaluation of the sentence, we do not believe there is a reasonable probability that the court would have imposed a lesser sentence had it been operating under an advisory guideline system. *Cf. Antonakopoulos,* 399 F.3d at 81 (stating that "if the district judge has said at sentencing that he would have reached the same result regardless of the mandatory nature of the Guidelines, that is a powerful argument against remand"). Accordingly, we reject the defendant's importuning that the *Booker* error in this case requires resentencing.

**C. *The Ineffective Assistance of Counsel Claim.***

**\*12** [28] Last--and, as it turns out, least--the defendant posits that he was denied the effective assistance of counsel, implying that his trial attorney erred in not arguing manufactured exigency at the suppression hearing and flatly stating that his lawyer blundered in failing to explore the possibility of a conditional guilty plea under Fed.R.Crim.P. 11(a)(2). [FN5]

[29][30] Establishing ineffective assistance of counsel "requires a showing that the [defense] attorney turned in a constitutionally deficient performance that prejudiced the defendant's substantial rights." *United States v. Moran,* 393 F.3d 1, 10 (1st Cir.2004) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In all but extraordinary circumstances, however, a claim of ineffective assistance that is raised for the first time in this court will not be entertained. *See United States v. Mala,* 7 F.3d 1058, 1063 (1st Cir.1993) ("We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court.") (collecting cases).

The defendant cannot elude the grasp of this line of authority. It would serve no useful purpose to rehash the

precise details of his theory. Suffice it to say that the theory presupposes that an accused with little chance of acquittal and a weak but colorable argument for suppression is invariably better served by a conditional guilty plea. That is a fallacious premise. Every case is different, and every lawyer knows (or ought to know) the dangers of broad generalization. Without a fact-specific inquiry into defense counsel's thinking (strategic and tactical) and a knowledge of what exchanges occurred between counsel and client, any decision we might make on the performance prong of the ineffective assistance test would be inherently speculative. We therefore decline to pass upon the defendant's ineffective assistance of counsel claim without the benefit of a fully developed record. Hence, that claim is premature, and we deny it without prejudice to its subsequent reincarnation, should the defendant so elect, in a post-conviction proceeding brought pursuant to 28 U.S.C. § 2255.

**III. CONCLUSION**

We need go no further. To recapitulate, we conclude that the police lawfully entered the defendant's abode pursuant to the emergency aid branch of the exigent circumstances doctrine; that they lawfully undertook a protective sweep of the premises following their entry; and that, therefore, the district court did not err in refusing to suppress the evidence seized from within the apartment. We also conclude that the district court appropriately classified the defendant as a career offender and committed no reversible error in the course of sentencing him. Finally, we conclude that the defendant's ineffective assistance of counsel claim is premature and must be dismissed, without prejudice, on that ground.

**\*13 *The defendant's conviction and sentence are affirmed.***

FN* Of the Tenth Circuit, sitting by designation.

FN1. Our opinion in *Beaudoin* disposed of the appeals of two defendants. The Supreme Court denied certiorari in Beaudin's case, but vacated his codefendant's sentence in light of its decision in *United States v. Booker,* --- U.S. ----, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). *See Champagne v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1502939                                                                Page 14

--- F.3d ---

**(Cite as: 2005 WL 1502939 (1st Cir.(Mass.)))**

*United States,* --- U.S. ----, 125 S.Ct. 1025, 160 L.Ed.2d 1009 (2005). The vacation of the judgment vis-à-vis Champagne in no way undercuts our affirmance of the conviction and, thus, *Beaudoin's* Fourth Amendment holding remains binding circuit precedent.

FN2. The defendant argues that Linskey entered the apartment before the boy stated that he was home alone. To bolster this argument, he points to inconclusive and ambiguous snippets culled from Linskey's testimony. But the district court found otherwise, and that finding was not clearly erroneous. *See Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir.1990)* (explaining that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous") (quoting *Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)*).

FN3. This holding makes it unnecessary to consider the government's argument that the district court clearly erred in finding that the child did not consent to Linskey's entry.

FN4. In conducting a reasonable suspicion inquiry, courts should recognize that veteran law enforcement officers, like Sergeant Linskey, are entitled to rely on their experience. *See Terry, 392 U.S. at 27; see also Woodrum, 202 F.3d at 6* (explaining that some "[d]eference is due to the experienced perceptions of the officers").

FN5. If such a plea could have been negotiated, it would have preserved the defendant's right to appeal the denial of his suppression motion while positioning him to secure a credit for acceptance of responsibility (which presumably would have resulted in a lower sentence).

2005 WL 1502939 (1st Cir.(Mass.))

**Briefs and Other Related Documents (Back to top)**

• 04-1474 (Docket) (Apr. 02, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.